UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
GEORGE THORSEN,

                              Plaintiff,

                -against-

COUNTY OF NASSAU, et al.,

                              Defendant.
----------------------------------------------------------X

**MEMORANDUM AND**
**ORDER**
CV 03-1022 (ARL)

**APPEARANCES:**

**LOUIS D. STOBER, JR.**
**SHEILA S HATAMI**
**LAW OFFICES OF LOUIS D. STOBER, JR. LLC**
Attorneys for Plaintiff
350 Old Country Road, Suite 205
Garden City, NY 11530

**JOHN CIAMPOLI**
**NASSAU COUNTY ATTORNEY**
**by: DIANE C. PETILLO**
**DONNA A. NAPOLITANO**
Attorneys for Defendants
One West Street
Mineola, New York 11501

**LINDSAY, Magistrate Judge:**

The plaintiff George Thorsen ("Thorsen") brought this action in February 2003 against

the County of Nassau, Nassau County Civil Service Commission, and John Carway ("Carway")

alleging: (1) violation of the First Amendment and the New York State Constitution pursuant to

42 U.S.C. § 1983; (2) constructive discharge; and (3) common-law defamation.  On July 10,

2009, the parties consented to the undersigned's jurisdiction.  (Docket Entry 51.)  A jury trial was

held from October 27, 2009, to November 6, 2009, during which the court dismissed Thorsen's

defamation claim.  On November 9, 2009, the jury found in favor of Thorsen on two of his

Section 1983 political affiliation claims and awarded him emotional distress damages in the amount of $1,500,000, and awarded punitive damages against the defendant Carway individually in the amount of $500,000. The jury found against Thorsen on his constructive discharge claim. At a post-trial hearing, the court dismissed one of the plaintiff's two Section 1983 claims under the so-called "policymaker" exception to First Amendment political affiliation law. *See Branti v. Finkel*, 445 U.S. 507, 517 (1980); *Elrod v. Burns*, 427 U.S. 347 (1976); *Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir. 1994).

Before the court is the defendants' motion under Federal Rules of Civil Procedure 50(b) and 59(a) for judgment as a matter of law or, in the alternative, for a new trial. The defendants argue that relief is warranted because: (1) the verdict sheet constituted plain error by permitting the jury to erroneously consider damages; (2) the damages award was excessive; (3) the verdict was inconsistent; and (4) the verdict was against the weight of the evidence. For the foregoing reasons, the defendants' motions are granted in part and denied in part.

## BACKGROUND

### I. Pretrial Proceedings

Thorsen commenced this action in February 2003. Thereafter, this matter was stayed pending resolution of related state court proceedings. In August 2006, Thorsen filed an amended complaint alleging a First Amendment violation resulting from his affiliation with a faction of the Nassau County Republican Party. (*See* Second Am. Compl. ¶¶ 52-64.) In particular, Thorsen claimed he was passed over for Director of Probation because of his political associations. Thorsen also claimed that he was stripped of all job responsibilities and subjected to a campaign of harassment and retaliation, including having an untrue story about him planted in the New

York Times because of his political associations.  (*Id.* ¶¶ 68-70.)  Thorsen claimed that as a result of the defendants' actions, he suffered severe emotional distress and was forced to retire from Nassau County in July 2002.  (*Id.* ¶¶ 75-84.)

## II.    Trial

In brief summary, the testimony at trial revealed that Thorsen began working for the Nassau County Probation Department in the 1970s.  (10/26 Tr. at 51-52.)  In 1996, Thorsen was promoted to the position of Assistant to Director.  (10/26 Tr. at 55-56, 66; 10/28 Tr. at 357-62, 382.)  As part of his duties, Thorsen developed and managed a highly regarded crime-prevention program called Operation Nightwatch.  (10/26 Tr. at 59-64; 10/27 Tr. at 134-37.)  This program teamed probation officers with police officers in pursuing law enforcement objectives.  Thorsen's job duties also included managing department personnel, acting as a liaison with other County departments, teaching at the police academy, running a student internship program, and writing grants.  (10/26 Tr. at 58, 64, 68; 10/28 Tr. at 384-86.)

Thorsen was active within the Nassau Republican Party during the years that he worked at the Probation Department.  He was known to be a supporter of Joseph Mondello ("Mondello"), the Nassau Republican Party Chairman.  (10/26 Tr. at 70-73, 75, 80-81, 103.)  Sometime in the 1990s, a rift developed within the Republican Party which pitted Mondello against Thomas Gulotta ("Gulotta"), then the Nassau County Executive.  (10/26 Tr. at 90-97, 106-07; 10/27 Tr. at 130-31; 10/28 Tr. at 274-78, 442-44; 11/2 Tr. at 559-60, 616-18, 620-31.)  That rift essentially divided party members into either the Gulotta or the Mondello camp.

In 1999, while the Gulotta/Mondello rift was ongoing, the position of Director of Probation became available.  Thorsen was encouraged by the outgoing Director to apply for the

position. (10/26 Tr. at 111-12.) As was the practice in Nassau County, Thorsen first applied for this position by going to the Republican Party and seeking Mondello's political support for his application. (10/26 Tr. at 111-14; 10/28 Tr. at 269-70.) Mondello agreed to support Thorsen's application and appointment. (10/26 Tr. at 114-15.) At about the same time, the defendant John Carway ("Carway"), who was the Deputy Director of Probation and aligned with the Gulotta camp, informed Gulotta of his interest in the Director position. (11/4 Tr. at 924.)

In addition to obtaining political support, a candidate for the Director's position had to be found qualified for the position by the Nassau County Civil Service Commission (the "Commission"). In June 2000, the Commission found Thorsen unqualified for the Director's position. This determination was apparently based on Thorsen's alleged lack of managerial experience. (10/27 Tr. at 179-81.) Thorsen clearly possessed management experience within the Probation Department. (10/26 Tr. at 64, 68.) Thorsen concluded that he was deemed unqualified because of his alignment with the Mondello faction of the Republican Party. In this regard, Thorsen presented evidence that the director of the Commission was aligned with Gulotta camp. (11/6 Tr. at 1216-17, 1246-48, 1262-64.) Thorsen also proved that John Carway, who was appointed Director over Thorsen, was also aligned with the Gulotta camp. (11/4 Tr. at 905-08.) Thorsen thereafter challenged the Commission's decision in an Article 78 proceeding, which resulted in a determination that the Commission's decision was arbitrary and capricious. (Pl.'s Exs. 120-21.)

On approximately January 31, 2001, while Thorsen was pursuing his Article 78 remedies, Carway was appointed Director of Probation. (10/27 Tr. at 196; 11/4 Tr. at 842, 930.) Thorsen testified that his life within the Probation Department took a dramatic turn for the worse after

Carway took charge. On February 2, 2001, Carway issued his first departmental memo as the Director. The memo announced that the successful program Operation Nightwatch would be reorganized. (10/27 Tr. at 197-200; Pl.'s Ex. 45.) Carway was well aware that Operation Nightwatch was Thorsen's "baby." (11/4 Tr. at 934-35.) On February 6, 2001, Carway reorganized Operation Nightwatch by removing Thorsen from the program and assigning him to another division within the Probation Department. Thorsen was instead given the mundane task of rewriting the department's peace officer manual. (10/27 Tr. at 200-04.) Thorsen was never told why he was removed from Operation Nightwatch or why he was reassigned. (*Id.* at 204.) Prior to Carway's appointment, Thorsen attended and participated in executive department meetings. After Carway's appointment, despite the fact that Thorsen retained the title Assistant to Director, he was not permitted to attend executive meetings and was no longer allowed to participate in executive decisions. (*Id.* at 206, 212.)

Thorsen testified that he was thrown into a deep depression by these developments. (*Id.* at 205; 10/30 Tr. at 494.) With respect to his work and everyday activities, Thorsen testified that he was essentially just going through the motions. (10/30 Tr. at 495-96.) Whereas he had enjoyed working in the Probation Department, he was now relegated to boring and mundane work. (10/27 Tr. at 208.) As for his symptoms, Thorsen suffered from "nausea, headaches, sleepless nights, a terrible feeling of worthlessness, and of victimization." (*Id.* at 205.)

Notwithstanding his depressed state of mind, Thorsen formed a committee to rewrite the peace officer's manual as directed by Carway. (*Id.* at 207.) Despite Carway's assurance that this was an important assignment, Carway never responded to any of Thorsen's memos on the subject, nor did Carway ask about the project. (*Id.* at 207-08.) Thorsen had little contact with

Carway and was never given another assignment to do.  (10/28 Tr. at 409-10.)  After Carway's

appointment, Thorsen no longer enjoyed any of the prestige or responsibility previously

associated with his position within the department.  (10/27 Tr. at 208-09.)

    As further proof of what Thorsen alleged was an effort by Carway to punish him for his

affiliation with the Mondello camp, Thorsen produced a New York Times interview of Carway.

(Pl.'s Ex. 65.)[1]  In it, Carway was highly complimentary of the success of Operation Nightwatch.

However, the article also indicated that Thorsen was removed as head of the program amidst

allegations in a lawsuit of racial and sex discrimination as well as political favoritism.  In fact,

that lawsuit did not name Thorsen, nor did the allegations pertain specifically to Operation

Nightwatch.  (10/27 Tr. at 220.)  Carway was well aware of the specific allegations of that

lawsuit when he gave the Times interview, because he was a named defendant and had already

been deposed.  (11/2 Tr. at 687-88.)  Thorsen felt that the article branded him as a racist and a

sexist.  (10/27 Tr. at 220.)  When Thorsen tried to question Carway about the article, Carway

offered no explanation for his reported comments.  (*Id*. at 223-25.)

    By 2002, Thorsen testified that he was in great emotional distress.  (*See*, *e.g.*, 11/2 Tr. at

568.)  Thorsen believed he was no longer an active member of the Probation Department.  (*Id*.)

As a result, in the summer of 2002, Thorsen retired because he "couldn't take it anymore" and

because he felt his "career as a probation official . . . was over."  (10/27 Tr. at 212.)  After

retiring from the Probation Department, Thorsen continued to teach as an adjunct professor at

---

[1] Although the court noted that the article was hearsay, the court admitted the document
into evidence based on the plaintiff's showing of trustworthiness and reliability.  (10/28 Tr. at
237-38.)

two local colleges. (10/26 Tr. at 65-66.) He also formed a consulting company called Justice Strategies. (10/30 Tr. at 503.)

Thorsen sought treatment with a psychologist, Dr. Christopher Bayer, starting in September 2000. (10/27 Tr. at 205.) He saw Dr. Bayer twice a week for six months, and then began seeing him once a week. (*Id.*) Thorsen was prescribed the antidepressants Celexa and Wellbutrin. (*Id.* at 206; 11/4 Tr. at 724.) Thorsen continued his treatment regularly with Dr. Bayer for four to five months and "maintained a relationship" with Bayer for at least a year and a half. (10/30 Tr. at 500.) Dr. Bayer testified that he began seeing Thorsen in the fall 2000. (11/4 Tr. at 721.) Dr. Bayer determined that Thorsen "obviously needed treatment. He had work-related problems. He appeared to be undermined by the management of his organization." (*Id.* at 723.) Dr. Bayer stated that Thorsen was "anxious, agitated, very unhappy, tearful on occasion. He was having an existential crisis and I thought that he would need medication." (*Id.*) Dr. Bayer testified that Thorsen became more distant with his family. (*Id.* at 725-26.)

As for Thorsen's emotional distress, Dr. Bayer stated that being removed from Operation Nightwatch "hurt him deeply," "drove him further into depression," "was devastating," and was "emotionally painful." (11/4 Tr. at 727, 743.) In particular, Dr. Bayer testified that Thorsen "started to avoid his colleagues. His sleep became impaired. He was visibly anxious. Tearful." (*Id.* at 727.) Dr. Bayer observed that Thorsen suffered a "major stress attack" in February 2001 that required hospitalization. (*Id.* at 726, 735-36.) Dr. Bayer further testified that Thorsen "was devastated" by the New York Times article, and that "it ripped him apart." (*Id.* at 770.)

Dr. Bayer observed that as of 2001, Thorsen "was crushed" and "[h]e had a very hard time functioning. He drifted away from his colleagues. He didn't have the same self respect."

7

(*Id.* at 729-30.) In sum, Dr. Bayer testified that Thorsen had expressed that "his life had been stolen from him, that what he worked for for [sic] decades had been undermined, that he had been betrayed by a system that he loved and cherished and had performed exceptionally well in. He was well respected by his colleagues. He won awards. In essence, he felt the rug had been pulled from out from under him." (11/4 Tr. at 745.) Dr. Bayer stated that Thorsen's work environment was "emotionally-toxic" and eventually caused Thorsen to retire. (*Id.* at 730.) Dr. Bayer testified that Thorsen began to reduce his treatment sessions after he retired. (*Id.* at 731-32.)

### III. Rule 50 Motions and the Charging Conference

At the close of the plaintiff's case, the defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50. The defendants sought dismissal of the libel and slander claims, which was granted. (11/4 Tr. at 775, 782-90.) Additionally, the defendants raised the argument that the Director of Probation position was exempt from First Amendment protection because it was a policymaking position. (*Id.* at 775-76.) The court deferred ruling on this issue until the parties fully researched and briefed the law. (*Id.* at 781-82, 790.) The defendants submitted a memorandum of law the following day, on November 5, 2010. (Docket Entry 99.) Thorsen submitted a response memorandum of law on November 9, 2010, the same day that the jury rendered its verdict. (Docket Entry 101.) A decision on this policymaker issue was rendered on November 10 after the jury's verdict.

The court provided the parties with a draft version of the jury charge and verdict sheet which reflected the plaintiff's three viable claims: (1) the failure to promote Thorsen to the Director of Probation due to his political affiliation; (2) the reduction of Thorsen's job duties due

to his political faction affiliation; and (3) constructive discharge.  At the charging conference, the plaintiff raised the question of whether emotional distress damages should be presented to the jury as one aggregate sum or should be divided among his three separate claims.  (11/5 Tr. at 23-24.)[2]  The defendants objected to any breakdown of damages by claim, stating that they "wouldn't want [the damages charge] broken down" into separate claim categories.  (*Id*. at 24.)  The court denied the plaintiff's application out of concern for a duplicative award given that the plaintiff's claims were so intertwined.  (*Id.* at 27.)  At no point during the charging conference or at any point prior to the commencement of jury deliberations did the defendants withdraw their objection to segregating the damages for each claim.

## IV.    The Verdict

On November 9, 2009, the jury rendered a verdict.  In response to special verdict questions, the jury found that: (1) the plaintiff proved that the defendants[3] knew that the plaintiff affiliated himself with a faction of the Republican Party; (2) the plaintiff proved under Section 1983 that his affiliation with a faction of the Republican Party was a substantial or a motivating factor in the decision of the defendants to deny him the appointment to Director of Probation; (3) the plaintiff proved under Section 1983 that his affiliation with a faction of the Republican Party was a substantial or a motivating factor in the decision of the defendants to reduce his job duties; and (4) the plaintiff did not prove that the defendants constructively discharged him because of

---

[2] The charging conference was transcribed electronically and the page numbers do not follow the same sequential order as other transcripts in this trial.

[3] By stipulation, the court referred to the defendants collectively as "the defendant" in both the charge and the verdict sheet.  (*See* 11/4 Tr. at 793-95.)  The court provided an explanation during the charge that "the defendant" meant the County of Nassau.  (*See* 11/9 Tr. at 1342-43.)

his affiliation with a faction of the Republican Party. The jury awarded the plaintiff $1,500,000 in emotional distress damages, and $500,000 in punitive damages against Carway.

## V. Post-Trial Proceedings

On November 10, 2009, the court determined that the Nassau County Director of Probation was a policymaking position under *Branti/Elrod* and its progeny, and thus granted the defendants' motion to dismiss this portion of the plaintiff's claim. (11/10 Tr. at 3-9.) As a result, the court set aside the jury's finding that the defendants' failure to promote Thorsen to Director of Probation violated the First Amendment. (*Id.* at 9.) The court determined that Thorsen's claim arising from the reduction in his job duties survived in light of the defendants' concession that the position held by Thorsen as Assistant to Director was not a policymaking position.

## ANALYSIS

The defendants now move under Federal Rules of Civil Procedure 50(b) and 59(a) for judgment as a matter of law or, in the alternative, for a new trial. The defendants argue that relief is warranted because: (1) the verdict sheet constituted plain error by permitting the jury to erroneously consider damages arising from Thorsen's failure-to-promote claim; (2) the damages award was excessive; (3) the verdict was inconsistent; and (4) the verdict was against the weight of the evidence.

## I. Standard

Federal Rule of Civil Procedure 50 provides for entry of judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis" to find in favor of the non-moving party as to the claim at issue. *See* Fed. R. Civ. P. 50(a)(1). "In reviewing such a

motion, [the court] must give deference to all credibility determinations and reasonable inferences of the jury, and may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008)). Rule 50 permits a party to move for judgment as a matter of law prior to the submission of the case to a jury. A party may not move for judgment as a matter of law for the first time after a verdict has been entered, but rather may renew a motion made prior the submission of the case to a jury. *See Ramos v. County of Suffolk*, -- F. Supp. 2d --, 2010 WL 1641454, at *4 (E.D.N.Y. Apr. 26, 2010). "Nevertheless, the Second Circuit has created an exception to this general rule, holding that a court 'may grant judgment as a matter of law where no Rule 50 motion was made, if necessary to prevent "manifest injustice."'" *Id*. (quoting *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003)). "The cases have provided little guidance on what constitutes 'manifest injustice' in this context, but rather appear to focus on the specifics of each fact pattern." *Ramos*, -- F. Supp. 2d at --, 2010 WL 1641454, at *4.

Federal Rule of Civil Procedure 59 permits the court to grant a new trial on all or some of the issues. "Generally, the grant of a new trial under Rule 59 is warranted only if the district judge is 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Ramos*, -- F. Supp. 2d at --, 2010 WL 1641454, at *5 (quoting *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 875 (2d Cir. 1992)); *see also DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998). "In comparison to a Rule 50 motion, the Second Circuit has held that the standard for a Rule 59 motion is less onerous for the moving party in two ways: first, 'unlike judgment as a matter of law, a new trial may be granted even if

there is substantial evidence supporting the jury's verdict.'  Second, in deciding a Rule 59 motion 'a trial judge is free to weigh the evidence [herself], and need not view it in the light most favorable to the verdict winner.'" *Ramos*, -- F. Supp. 2d at --, 2010 WL 1641454, at *6 (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134).

## II. The Verdict Sheet Was Not Plain Error

The defendants first contend that a new trial on the issue of damages is warranted because the court erred in presenting a special verdict sheet containing an aggregate emotional distress award as opposed to separate awards for each of the plaintiff's claims.  The defendants argue that this was plain error because the court permitted the jury to consider Thorsen's failure-to-promote claim, which the court dismissed after the verdict was rendered.  As a threshold matter, Thorsen contends that the defendants' argument is not preserved.  The court agrees.

The Federal Rules of Civil Procedure are clear that a party bears the affirmative duty to raise an objection to a charge or special verdict *before* the jury retires.  *See* FED. R. CIV. P. 49, 51. As the Supreme Court has long held, it well-established that rights may be forfeited "by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *U.S. v. Olano*, 507 U.S. 725, 731 (1993) (quoting *Yakus v. United States*, 321 U.S. 414, 444 (1944)) (internal quotation marks omitted).  This principle provides the court with "an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge."  *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 274 (1981) (citation and internal quotation marks omitted).  Rule 49(a)(3) thus proscribes that:

> A party waives the right to a jury trial on any issue of fact raised by the pleadings
> or evidence but not submitted to the jury unless, before the jury retires, the party
> demands its submission to the jury.  If the party does not demand submission, the

court may make a finding on the issue. If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.

Similarly, under Rule 51, a party is required to make their objection "on the record, stating distinctly the matter objected to and the grounds for the objection." FED. R. CIV. P. 51(c)(1).[4] The objecting party is required to object at the charging conference, or at the very least prior to the jury being charged. *See* FED. R. CIV. P. 51(b). Thus, a party may only assign an error to a jury instruction or verdict sheet "if that party properly objected." FED. R. CIV. P. 51(d)(1)(A),

Here, not only did the defendants fail to raise their foregoing objection, but they expressly objected to parsing out damages in the manner they now claim should have been done. (*See* 11/5 Tr. at 24.) The court adopted the damages special verdict sheet exactly as the defendants had advocated. The defendants current objection is simply disingenuous in light of the record, and the defendants' failure to object to the verdict sheet thus results in a waiver of their objection. *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002) (quoting *Lavoie v. Pacific Press & Shear Co., a Div. of Canron Corp.*, 975 F.2d 48, 55 (2d Cir. 1992)). As the Second Circuit held in an analogous situation, it is extremely difficult to "see how holding the defendants to a jury verdict that faithfully followed an instruction and verdict form that they themselves urged upon the court could give rise to a miscarriage of justice." *Shade v. Housing Auth. of City of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001). The court thus finds that the defendants' argument was waived and therefore is not preserved.

Even though the defendants' objection is not preserved, the Federal Rules permit the

---

[4] Rule 51 applies to both the jury charge and the special verdict form. *See Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002).

court to consider their application under a plain-error standard. *See* Fed. R. Civ. P. 51(d)(2). The advisory committee notes explain that:

> Many circuits have recognized that an error not preserved under Rule 51 may be reviewed in exceptional circumstances. The language adopted to capture these decisions in subdivision (d)(2) is borrowed from Criminal Rule 52. Although the language is the same, the context of civil litigation often differs from the context of criminal prosecution; actual application of the plain-error standard takes account of the differences.

Fed. R. Civ. P. 51 (2003 advisory committee notes). Thus, "the plain error exception 'should only be invoked with extreme caution in the civil context.'" *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996) (quoting *United States v. Carson*, 52 F.3d 1173, 1188 (2d Cir.1995), *cert. denied*, 516 U.S. 1122 (1996)). "Only where an unpreserved 'error is so serious and flagrant that it goes to the very integrity of the trial' will a new civil trial be warranted." *Pescatore*, 97 F.3d at 18 (quoting *Brenner v. World Boxing Council*, 675 F.2d 445, 456 (2d Cir. 1982), *cert. denied*, 459 U.S. 835 (1982)). Under this highly stringent standard, and under the facts of this case, the defendants have not shown that such relief is warranted.

The defendants disingenuously argue that the court committed plain error by "delaying" its ruling on the policymaker defense and thus allowing the jury to consider damages that were not caused by a valid claim. This argument completely ignores the fact that the delay was caused by the defendants, who had almost six years to raise the policymaking issue and failed multiple times to submit a timely summary judgment motion in accordance with the schedule set by the court. Even after the court invited the defendants to submit a late summary judgment motion, they declined to do so and instead chose to first raise the issue in a motion in limine submitted close to trial. (*See* Docket Entry 88 at 16.) The court resolved the motion at the earliest

opportunity.  Accordingly, this record does not provide a basis for relief under Rule 51.[5]

Further, the defendants' assertion that the "late" dismissal of this claim provided the plaintiff a windfall in damages is not only based on sheer conjecture, but is unsupported by the record.  Throughout his testimony, Thorsen testified that his emotional distress damages were the byproduct of his feelings of being victimized by Carway because of his party faction affiliation.  Although the defendants make much about Thorsen receiving psychotherapy in September 2000, prior to the reduction in job duties, both Thorsen and Dr. Bayer each testified that Thorsen's emotional distress was inextricably woven into the reduction of his job duties.  For instance, Dr. Bayer testified that Thorsen suffered a "major stress attack" in February 2001, after Thorsen's job duties had been reduced.  Dr. Bayer testified that Thorsen being removed from Operation Nightwatch "hurt him deeply," "drove him further into depression," "was devastating," and was "emotionally painful."  Further, Dr. Bayer testified that Thorsen "was devastated" and was "ripped . . . apart" by the New York Times article, which referenced Thorsen being removed from Operation Nightwatch, and which was published in March 2001.

_____

[5] The deadline to commence dispositive motion practice was April 10, 2009. (*See* Minute Order 40.)  On May 22, 2009, the defendants filed an untimely request to move for summary judgment before Judge Mauskopf.  (Docket Entry 45.)  Judge Mauskopf nonetheless granted leave to file summary judgment and directed to the parties to appear at a conference on June 26, 2009, to advance this process.  (*See* Docket Entry dated 5/27/2009.)  The defendants did not file a motion.  Instead, in July 2009, the parties consented to the undersigned's jurisdiction stating they were ready for trial in September or October 2009.  (Docket Entry 52.)  On September 2, 2009, the defendants again requested leave to file for summary judgment.  At a pretrial conference held on September 3, 2009, to set a trial date, the court granted the defendants' application to file a late summary judgment motion but cautioned that a trial date of October 27 in this six-year-old case would not be adjourned.  The defendants withdrew their request to file for summary judgment.  (Docket Entry 59.)  The defendants then first raised the policymaker issue in a motion in limine.  (*See* Docket Entry 88 at 16.)  It was the defendants' failure to timely raise this issue that led to its submission to the jury.  (*See* 11/10 Tr. at 2-3.)

15

Similarly, Thorsen testified at length that being removed from Operation Nightwatch, which Carway acknowledged was Thorsen's "baby," was extremely hurtful and caused him to go deeper into a depression. As part of the alleged campaign to destroy his reputation, Thorsen testified that the New York Times article made him feel branded as "a racist and a sexist" incapable of running Operation Nightwatch. Thorsen also testified at length about the emotional distress he felt working on the peace officer's manual, which he found was a very mundane task and lacked any guidance or support from Carway. Thorsen testified that he was no longer involved in executive decisions and did not have the same level of prestige within the Probation Department. The evidence also showed that Thorsen withdrew from his colleagues and family out of embarrassment. In sum, the evidence demonstrated that Thorsen's emotional distress was intertwined amongst being removed and ostracized from management as well as the failure to promote him. There is clear authority that trial courts should avoid providing a plaintiff with duplicative recovery on intertwined causes of action. *See Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996); *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995); *Gentile v. County of Suffolk*, 926 F.2d 142, 154 (2d Cir. 1991). Accordingly, the court did not commit plain error when it required the jury to consider only a single aggregate sum of emotional distress damages because those damages were inextricably woven between the plaintiff's two causes of action.

### III.    The Jury's Findings Were Not Inconsistent

The defendants next argue that a new trial is warranted because the jury's findings were inconsistent. The defendants claim that the jury's finding that Thorsen was not constructively discharged is inconsistent with their finding that Thorsen suffered a reduction in job duties due to

his political affiliation.  The defendants thus argue that the jury awarding $1,500,000 in emotional distress damages "had much more to do with" Thorsen's failure to promote claim than the reduction of his job duties.  The jury's findings are not inconsistent and a new trial is not warranted on this basis.

Judgment via a special verdict may not be entered where the jury's findings are inconsistent.  *See Lavoie*, 975 F.2d at 53 (citing *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 890-91 (2d Cir. 1988)).  However, as with all Rule 59 motions for a new trial, the granting of a new trial for an inconsistent special verdict is circumscribed.  *Id*. ("When the verdicts are not capable of reconciliation and resubmission of the determinations for reconsideration or clarification is not possible because the jury has been discharged, a new trial may be -- *but is not always* -- required.") (emphasis added).  As the Second Circuit recently warned, the court "should not invalidate a judgment entered on the basis of a facially valid and proper jury verdict and require a costly and wasteful retrial merely because of a speculative possibility that facially consistent jury findings might have represented an inconsistency." *Aczel v. Labonia*, 584 F.3d 52, 59 (2d Cir. 2009) (citing *Akermanis v. Sea-Land Serv.*, 688 F.2d 898, 906 (2d Cir. 1982)).  Further, the court should if at all possible attempt to harmonize a special verdict rather than granting a new trial.  *Id*. at 59-60 (citing *Gallick v. Balt. & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963); *Turley v. Police Dep't of City of N.Y.*, 167 F.3d 757, 760-61 (2d Cir. 1999)).

To the extent that the jury's verdict requires any harmonizing at all, it is apparent that the jury found that the defendants' actions in reducing Thorsen's job duties were caused by his political affiliation, but the jury simply did not agree that Thorsen left for those same reasons.

Given the testimony at trial, the jury could have concluded that Thorsen also left the department in order to develop his newly formed company Justice Strategies. Because the jury verdict is not inconsistent, a new trial is not warranted.[6]

## IV.  The Jury's Findings Were Not Against the Weight of the Evidence

The defendants next move for judgment as a matter of law because the jury's verdict was against the weight of the evidence. In particular, the defendants argue that Thorsen failed to prove that: (1) Carway held a position of authority within the Republican Party; and (2) Thorsen did not plead or prove a First Amendment retaliation claim because his complaint referred to the Article 78 proceedings rather than the reduction in job duties. Both arguments are raised for the first time post-trial and are therefore unpreserved. "A post-trial motion for judgment as a matter of law under Rule 50(b) 'is limited to those grounds that were specifically raised in a prior Rule 50(a) motion; the movant is not permitted to add new grounds after trial.'" *Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 212 (E.D.N.Y. 2009) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998)). Thus, the defendants were required to "specify the law and facts that entitle" them to judgment prior to the jury retiring. FED. R. CIV. P. 50(a)(1)(B).

At no time prior to the jury receiving the case did the defendants move for judgment as a matter of law ("jmol") on either of the grounds that they argue herein. At the close of the plaintiff's case, the defendants only moved for jmol on their policymaker defense and for a

---

[6] The court declines the defendants' invitation to join in their speculation that the jury's award of $1,500,000 "had much more to do with" the plaintiff's failure-to-promote claim. Pursuant to the court's instructions, the jury was only permitted to award emotional distress damages that Thorsen suffered as a result of the defendants' actions. As noted above, Thorsen's emotional distress was inextricably woven between his claims.

directed verdict on Thorsen's defamation claim. (*See* 11/4 Tr. at 775.) The defendants now assert that they did not waive their right to move for jmol and claim that they were prevented from raising these issues when the court blocked their bizarre decision to read their written Rule 50 memorandum into the record at the conclusion of the plaintiff's case. Instead, the court merely directed the defendants to submit the written motion, which they did the following day. That memorandum did not raise either argument presented here. At best, the memorandum generally argued that Thorsen had failed to prove that his "political affiliation was a substantial or motivating factor in the adverse employment decision." (*See* Docket Entry 99 at 4.) Nowhere in the written memorandum did the defendants even refer to whether Carway held a position of authority within the Republican Party or attempt to argue that the plaintiff's retaliation claim should be limited in the manner they now argue. The defendants have presented no evidence that they raised either of the foregoing arguments at any time prior to the jury receiving the case. Accordingly, these arguments are waived.

Even if the court were to find that the defendants have not waived these arguments, the applications fail on the merits. As to whether Carway held a position of authority within the Republican Party, the court must give deference to the jury's credibility determinations and reasonable inferences. *See Kinneary*, 601 F.3d at 155. Thorsen presented considerable testimony of a rift within the Republican Party between factions led by Mondello and Gulotta. Thorsen also presented evidence that he was known to be aligned with Mondello, including evidence that his application for the Director of Probation was endorsed by Mondello. In contrast, there was evidence that Carway applied for the position through Gulotta. Although the court dismissed Thorsen's failure-to-promote claim, this evidence supports the jury's finding that

the subsequent reduction in Thorsen's job duties was substantially motivated by Thorsen's political affiliation with the "wrong" faction of the Republican Party. Accordingly, jmol is not warranted.

The latter argument that Thorsen did not plead or prove First Amendment retaliation is somewhat baffling given the well-versed requirement that pleadings must merely give notice of underlying claims. *See* FED. R. CIV. P. 8(a)(2); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Thorsen's second amended complaint made specific reference to being removed from his job duties, thus putting the defendants on notice of a separate First Amendment retaliation claim on this basis. (*See* Second Am. Compl. ¶¶ 68-70.) As discussed throughout the trial, the plaintiff argued and the court construed Thorsen's allegations to include a claim of retaliation arising from the reduction in his job duties. At no time before or during the trial did the defendants assert that this was an unpled claim. The defendants' attempt to now limit Thorsen's claims is not only untimely but is entirely inconsistent with the complaint itself, the defendants's position at trial, and the evidence presented. Moreover, the defendants' argument that Thorsen should be limited to a free-speech claim is incoherent in light of well-established law that freedom from retaliation for political affiliation is a protected right under the First Amendment. *See Branti*, 445 U.S. at 516-17; *Elrod*, 427 U.S. at 350.[7] Accordingly, even if the court were to consider the defendants' arguments for jmol, they would also fail on the merits.

---

[7] The court does not agree with the defendants that *Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008), which addressed whether speech by a public official is a matter of public concern, is at all relevant to Thorsen's political affiliation claims, let alone that this argument is timely.

**V.    The Emotional Distress Award Was Excessive**

Finally, the defendants argue that the award of $1,500,000 in emotional distress damages was excessive, warranting either a new trial on damages or the grant of remittitur in lieu of a new trial.[8]  "A remittitur, in effect, is a statement by the court that it is shocked by the jury's award of damages."  *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).  If a district court finds that a verdict is excessive, it may order a new trial, order a new trial limited to damages, or, under the practice of remittitur, condition denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount.  *Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005).  However, it is not among the powers of the trial court, where the jury has awarded excessive damages, simply to reduce the damages without offering the prevailing party the option of a new trial.  *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995) (citing *Vasbinder v. Scott*, 976 F.2d 118, 122 (2d Cir. 1992)).

In determining whether the grant a motion for remittitur, it is appropriate to refer to other awards in similar cases, although the court should not limit its review too narrowly.  *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 568 (S.D.N.Y. 2008) (citing *Ismail*, 899 F.2d at 186-87).  The court is also guided by the following framework:

> Emotional distress awards within the Second Circuit can generally be grouped
> into three categories of claims: garden-variety, significant and egregious.  In
> garden variety emotional distress claims, the evidence of mental suffering is
> generally limited to the testimony of the plaintiff, who describes his or her injury
> in vague or conclusory terms, without relating either the severity or consequences
> of the injury.  Such claims typically lack extraordinary circumstances and are not
> supported by any medical corroboration.  Garden variety emotional distress claims
> generally merit $30,000 to $125,000 awards.

---

[8] The defendants have not challenged the award of punitive damages.

> Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. Finally, egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff. In significant or egregious cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

*Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46-47 (E.D.N.Y. 2009) (internal citations and quotation marks omitted). The defendants thus argue that Thorsen's emotional distress fall within the garden-variety category and, citing garden-variety cases, suggest that an award no greater than $100,000 is appropriate.

Given the evidence produced at trial, the court does not agree that Thorsen's emotional distress damages are garden-variety. Both Thorsen and his treating psychologist Dr. Bayer testified at length about Thorsen's depression and anxiety arising from the reduction in his job duties. The evidence showed that Thorsen saw Dr. Bayer twice a week for approximately six months, and that he continued to receive therapy for around a year-and-a-half until his retirement from Nassau County. The evidence also showed that Thorsen was prescribed both Celexa and Wellbutrin to treat his symptoms. Dr. Bayer testified in detail about Thorsen's emotional state, describing it as "anxious, agitated, very unhappy, tearful on occasion." Dr. Bayer also testified that being removed from Operation Nightwatch "hurt [Thorsen] deeply," "drove him further into depression," "was devastating," and was "emotionally painful." Both Thorsen and Dr. Bayer described Thorsen's physical symptoms, which included visible anxiety, tearfulness, nausea, headaches, and difficulty sleeping. The evidence also showed that Thorsen became detached from his family and co-workers. Most significantly, Dr. Bayer testified that Thorsen suffered

from what he termed a "major stress attack" in February 2001 that required hospitalization. Although the defendants are correct that the evidence shows that Thorsen was able to continue working throughout his depression, Thorsen testified that he was essentially going through the motions during this time. Further, Carway's involvement in the New York Times article, which Thorsen and Dr. Bayer both testified significantly increased his emotional distress, constitutes an extraordinary circumstance that moves this case beyond mere garden-variety. Accordingly, the court finds that Thorsen's emotional distress damages are properly categorized as significant rather than merely garden-variety.

Nonetheless, even where a court finds that emotional damages are significant, remittitur may still be appropriate. The defendants rely upon *Rainone v. Potter*, 388 F. Supp. 2d. 120 (E.D.N.Y. 2005), and *McGrory v. City of New York*, No. CV 99-4062(FM), 2004 WL 2290898 (S.D.N.Y. Oct. 8, 2004), as equivalent cases. In *Rainone*, the court found $175,000 in compensatory damages was excessive even though the plaintiff's emotional distress was "more than mere 'garden variety.'" 388 F. Supp. 2d at 126. The court was persuaded by the fact that "there was no evidence of physical manifestations of emotional distress or debilitating alterations in lifestyle, and no evidence of permanency," and thus found that an award of $50,000 was appropriate. *Id*. Similarly, in *McGrory*, the court found that the jury's award of $533,390 was motivated by "sympathy" because the plaintiff's physicians "attributed most, if not all" of the plaintiff's emotional distress to events unrelated to his termination. No. CV 99-4062(FM), 2004 WL 2290898, at *15. The court noted that the plaintiff referred "only in passing" to his termination as the cause for his mental distress. *Id*. As a result, the court found that an award of $100,000 was appropriate. *Id*. at *17.

23

Further research shows a wide range of emotional distress awards for violations of a plaintiff's Section 1983 claims that are deemed to be significant. At the high end, the Southern District of New York found that $4,000,000 in emotional distress damages under Title VII was "a very full verdict" but not excessive given that the plaintiff was not awarded punitive damages and given that she had introduced significant evidence that her reputation was destroyed in retaliation for bringing gender discrimination complaints. *See Osorio v. Source Enter's.*, No. CV 05-10029(JSR), 2007 WL 683985, at *5 (S.D.N.Y. Mar. 5, 2007). More typically, however, courts in this Circuit in equivalent circumstances have routinely found that awards ranging from $100,000 to $500,000 are not excessive for significant emotional distress damages. *See llips v. Bowen*, 278 F.3d 103, 111-12 (2d Cir. 2002) (award of $400,000 for Section 1983 First Amendment retaliation claim was not excessive); *Port Auth. Police Asian Jade Soc. of New York & New Jersey Inc. v. Port Auth. of New York & New Jersey*, 681 F. Supp. 2d 456, 470 (S.D.N.Y. 2010) (awards of $250,000 to two plaintiffs was extremely large for Title VII discrimination claim, but did not shock the judicial conscious sufficient to warrant a reduction); *Olsen*, 615 F. Supp. 2d at 49 (awards of $500,000, $400,000 and $100,000 to three plaintiffs on Title VII and Section 1983 claims were not excessive); *Simmons v. New York City Transit Authority*, No. CV 02-1575(CPS)(RLM), 2008 WL 2788755, at **9-10 (E.D.N.Y. July 17, 2008) (award of $150,000 was not excessive for Title VII retaliation claim); *Marchisotto v. City of New York*, No. CV 05-2699(RLE), 2007 WL 1098678, at *11 (S.D.N.Y. Apr. 11, 2007) (award of $300,000 was not excessive for Title VII retaliation claim); *Petroyits v. New York City Transit Auth.*, No. CV 95-9872(DFE), 2003 WL 22349676, at *5 (S.D.N.Y. Oct.15, 2003) (award of $150,000 not

excessive for Title VII discrimination claim).[9]

An award of $1,500,000 to Thorsen falls outside of the typical range of emotional distress damages in equivalent cases. In arriving at their verdict, it was proper for the jury to consider the personal humiliation and loss of reputation that Thorsen suffered by being removed from his job duties. *See Henry v. Gross*, 803 F.2d 757, 768 (2d Cir. 1986) ("It is a basic principle of tort law in general, and of civil rights law in particular, that compensable injuries may include not only monetary losses such as out-of-pocket expenses but also injuries such as 'personal humiliation' and 'mental anguish.'") (quoting *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306-08, (1986)); *Stolberg v. Bd. of Trustees*, 474 F.2d 485, 488 (2d Cir. 1973) (proper for jury to consider harm to the plaintiff's reputation caused in retaliation for lawful exercise of First Amendment rights). This evidence included not only being removed from Operation Nightwatch and being reassigned to the very mundane task of rewriting the peace officer manual, but also being inaccurately blamed for departmental problems as evidenced by the New York Times article. It is clear from the full award that the jury credited Thorson's allegations that, not only did the defendants remove him from his job duties, but in doing so they subjected him to personal humiliation and attempted to destroy his professional reputation in retaliation for his political affiliation. On the other hand, the jury found for the defendants on Thorsen's

---

[9] Section 1983 First Amendment cases in other Circuits tend to result in lesser awards. For example, in *Dossett v. First State Bank*, the Eighth Circuit Court of Appeals held that an award of $1,500,000 for emotional distress damages in a First Amendment retaliation case was "unprecedented" in that Circuit, and thus the district court had properly found that the award was "a product of passion and prejudice" and warranted a new trial. 399 F.3d 940, 946 (8th Cir. 2005). Similarly, jury awards for emotional distress in Section 1983 First Amendment claims in the Fifth Circuit tend to be under $100,000. *See Jordan v. Ector County*, 516 F.3d 290 (5th Cir. 2008) (affirming $64,000 jury award); *Wiggins v. Lowndes County, Miss.*, 363 F.3d 387 (5th Cir. 2004) (affirming $10,144 jury award).

constructive discharge claim. The jury thus found that Thorsen was not subjected to treatment that was so difficult or intolerable or abusive or unpleasant that a reasonable employee in the plaintiff's place would have felt compelled to resign. (*See* 11/9 Tr. at 1346-47.) The evidence also indicates that the jury did not wish to compensate Thorsen for an indefinite period of time. Upon his retirement from Nassau County, Thorsen stopped seeing Dr. Bayer and by that point had ceased taking antidepressants. Thorsen did not produce any evidence to show that he has required any additional treatment since this time period, nor did he show that he has suffered any long-term or lasting effects resulting from the defendants' retaliation. In light of the limited nature of Thorsen's emotional distress, an award of $1,500,000 shocks the judicial conscious and is therefore excessive.

Given the above, an award at the high end of typical emotional distress damages in equivalent cases would not be excessive. The award for emotional distress should therefore be reduced from $1,500,000 to $500,000. There will be a new trial on damages unless Thorsen agrees to the reduction to the sum of $500,000 for his emotional distress damages. If this remittitur is accepted, Thorsen would be entitled to $500,000 in compensatory damages, as well as the punitive damages awarded against Carway in the amount of $500,000.

## CONCLUSION

For the foregoing reasons, the defendants' motions pursuant to Federal Rules of Civil Procedure 50(b) and 59(a) are granted in part and denied in part. There will be a new trial on damages unless Thorsen agrees to the reduction to the sum of $500,000 for his emotional distress damages. The defendants' remaining motions are denied.

Dated: Central Islip, New York
      June 30, 2010

**SO ORDERED:**


_____/s/_____
ARLENE ROSARIO LINDSAY
United States Magistrate Judge